**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VINCENT MORRIS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 10-5431 |
| PHILADELPHIA HOUSING AUTHORITY, et al., | : | |
| | : | |
| Defendants. | : | |

<u>**SECOND MEMORANDUM ON MOTIONS TO DISMISS**</u>

**Baylson, J.**                                                                                  **July 29, 2011**

Plaintiff Vincent Morris ("Morris") filed claims under 42 U.S.C. § 1983, 42 U.S.C. §

1985, and Pennsylvania's Whistleblower Law, 43 Pa. Stat. Ann. §§ 1421-28 (the "PWL"),

against the Philadelphia Housing Authority ("PHA"), PHA Tenant Support Services, Inc.

("TSSI"), Carl Greene, Asia Coney, and Diane Rosenthal.[1]  (Am. Compl., ECF No. 58.)  Morris

is a former high ranking employee of PHA.  Defendants, for the most part, filed separate motions

to dismiss asserting various grounds for dismissal.[2]  The Court previously granted in part

Defendants' earlier motions to dismiss for insufficient pleading and granted Morris leave to file

---

[1]        Morris is no longer pursuing claims against Carolyn Carter, Nellie Reynolds, Linda Staley, or Gloria Redd.

[2]        Rosenthal (ECF No. 59) and Greene (ECF No. 64) filed separate Motions to Dismiss.  Coney filed with TSSI.  (ECF No. 60.)  PHA filed one motion (ECF No. 61) and then an amended motion (ECF No. 62).  The only apparent difference between the two is that the latter includes exhibits referenced in but not attached to the former.  Plaintiff filed an omnibus opposition to Defendants' Motions.  (Omnibus Opp'n, ECF No. 66.)  Greene, Rosenthal, and PHA then filed replies.  (ECF Nos. 67, 68, 70.)  By letter, the Court also requested the parties to submit supplemental letters regarding the impact of the Supreme Court's opinion in <u>Borough of Duryea v. Guarnieri</u>, No. 09-1476, 2011 WL 2437008 (U.S. June 20, 2011), which was decided after Defendants' moved for dismissal.

an amended complaint.  See Morris v. Phila. Hous. Auth., No. 10-5431, 2011 WL 1661506, at *6 (E.D. Pa. Apr. 28, 2011).  The Court reserved decision on the other legal grounds raised in the earlier motions.  With a fresh round of briefing on those legal grounds and after oral argument, the Court will **grant** Defendants' Motions to Dismiss.

## I.      Factual and Procedural Background[3]

According to relevant allegations in the Amended Complaint, Morris served as PHA Executive Director Carl Greene's Executive Assistant from 1999 until resigning in 2010.  (Am. Compl. ¶ 2.)  During his time at PHA, Morris claims he raised concerns to Greene, Coney, and Rosenthal that PHA and TSSI were engaging in improper and illegal lobbying activities using federal funds and that there was ongoing fraud, inefficiency, and waste at PHA and TSSI.  (Id. ¶ 5.)  Morris alleges that, in response, Defendants conspired to deprive Morris of his rights under the First and Fourteenth Amendments by retaliating against him for his speech and depriving him of equal protection and due process.  (Id.)  Further, Morris alleges Defendants' conduct violated the PWL.  (Id.)

According to Morris, in 2002, PHA received approximately $342 million from the U.S. Department of Housing and Urban Development ("HUD") as part of HUD's Moving to Work Program ("MTW").  (Id. ¶¶ 15-16.)  Morris asserts that PHA, as directed by Defendants Greene and Coney, abused those federal funds.  According to Morris, the MTW prohibited PHA and TSSI "from using any federal funds for lobbying activity or to influence or attempt to influence the awarding of any Federal contract."  (Id. ¶ 18.)  Certifications to HUD were required.  (Id.)

---

[3]      This factual history is derived from the Court's original Memorandum as supplemented by Morris's Amended Complaint.

Morris contends he discovered Greene and Coney directed the use of PHA funds for lobbying efforts in contravention of federal law and that Greene provided false certification denying such activity.  (Id. ¶¶ 20-23.)

According to Morris, while he was employed as Greene's Executive Assistant, his direct supervisors included Coney, Michael Leithead, Carolyn Carter, and Linda Staley.  (Id. ¶ 24.)  His duties included "the supervision and oversight of various troubled departments at PHA including . . . PHA's non-profit organizations including TSSI" and he was also required "to perform work for Equity PAC, a political action committee," which Coney directs.  (Id. ¶¶ 2, 25.)  In addition, Greene "ordered [Morris] to engage in various lobbying and political activities," which Morris alleges were not part of his "official duties."  (Id. ¶ 26.)

While employed in these positions, Morris alleges he became aware of and complained about many instances of improper conduct at PHA, TSSI, and Equity PAC.  Morris's allegations are explained in more detail below.  The Court believes the allegations are appropriately grouped into three categories: (1) alleged lobbying and political activities; (2) alleged financial impropriety at TSSI; and (3) other objections or complaints.

**Alleged Lobbying and Political Activities**

In June 2006, Greene "ordered" Morris to coordinate speakers for an event to kick-off the establishment of the Pennsylvania Institute for Affordable Housing Professionals ("PIAHP"), an organization Morris believed Greene was using "as a tool to force contributions which would be diverted to be used for the costs of the lobbying activities."  (Id. ¶¶ 28-31.)  Morris objected and opined Greene was requiring executive level staff and managers to make donations "as a ploy to control nonunion staff."  (Id. ¶ 31.)  According to Morris, Greene threatened to fire Morris for his

comments.  (Id.)

In September 2006, Greene and Coney "ordered" Morris to organize a bus trip for PHA residents to attend a fund-raising event in Pittsburgh, Pennsylvania.  (Id. ¶ 32.)  When Morris objected to Greene that the event constituted impermissible lobbying, Greene admonished Morris, "Shut up and do your job.  If you want to keep your job, you will do it."  (Id. ¶ 33.) Morris also expressed concerns to Coney that TSSI was using federal funds received from PHA to pay for expenses related to the Pittsburgh event.  (Id. ¶¶ 34-35.)  Morris does not allege how Coney responded.  (See id. ¶ 35.)

In October 2006, Greene "ordered" Morris and a PHA attorney to travel to Harrisburg, Pennsylvania to lobby for state legislators' support to preserve PHA's federal funding.  (Id. ¶ 37.) Morris does not allege he objected or complained.  (See id.)

In January 2007, Coney used TSSI funds to pay for a mailing campaign by PHA residents to protest proposed federal funding cuts.  (Id. ¶ 43.)  Morris complained to Greene, but Greene ignored the complaints.  (Id. ¶ 44.)  In June 2007, Morris complained about another bus trip, this time to Washington, D.C. to protest federal funding cuts.  (Id. ¶ 45.)  Greene "required" Morris to coordinate lobbying efforts, and when Morris opposed the use of PHA's federal funds to pay for the event, Greene allegedly "threatened to fire [Morris] if he did not comply with his orders." (Id. ¶¶ 45-46.)

**Alleged Financial Impropriety at TSSI**

While overseeing TSSI, Morris uncovered several instances of alleged fraud and embezzlement.  For instance, in March 2007, Morris discovered that a TSSI officer concealed that she borrowed money from the TSSI payroll account to pay her mortgage.  (Id. ¶ 51.)  Morris

informed Coney, but she ignored his complaint, failed to discipline the TSSI officer, and
concealed the fraud.  (Id.)

Then, in February or March 2008, Morris learned that Coney and the same officer paid
themselves twice for one pay period.  (Id. ¶ 52.)  Although Greene also expressed concern
regarding possible public exposure of the scheme, Coney refused to submit TSSI payroll
supervision to Rosenthal and arranged to repay the funds.[4]  (Id.)  Morris also informed Rosenthal
of additional payroll schemes at TSSI, but Rosenthal failed to alert law enforcement and instead
arranged for Coney and the other TSSI officer to repay the funds.  (Id. ¶ 53.)  When Rosenthal
asked Morris to confirm the repayment, he refused.  (Id.)

In June or July 2009, Morris also expressed concern to Coney and Linda Staley when
Coney and another employee pilfered approximately $20,000 in excess TSSI payroll funds, as
well as about other governance concerns at TSSI.  (Id. ¶¶ 54-55.)  Morris alleges these concerns
were ignored.  (Id. ¶ 55.)

In December 2009, Morris discovered that TSSI employees were engaging in fraud
during TSSI's Toys-for-Tots program.  (Id. ¶ 56.)  According to Morris, employees were
purchasing extra toys and re-selling them on for personal gain and otherwise altering receipts.
(Id. ¶ 57.)  Coney ignored Morris's complaints.  (Id.)

**Morris's Other Objections or Complaints**

In December 2007, HUD declared PHA in default of the MTW.  (Id. ¶ 38.)  PHA
responded by filing suit against HUD and its then-secretary, Alphonso Jackson, challenging the

---

[4]      Morris alleges that Rosenthal was responsible for reimbursing TSSI for vendor
payments, approving all of TSSI's expenditures, and supervising TSSI's fiscal audits.  (Am.
Compl. ¶ 50.)

lawfulness of HUD's action.  (Id. ¶ 39.)  According to Morris, before PHA filed suit, "Greene informed [him] that PHA was filing the lawsuit.  At that time, [Morris] expressed his opposition to the lawsuit" because of Greene's allegedly false certifications and illegal lobbying activities, which also violated MTW terms.  (Id. ¶ 40.)  Greene "ordered" Morris to rally support for the suit among politicians and residents.  (Id. ¶ 41.)  When Morris continued to object, Greene allegedly responded, "You're not a lawyer and I pay you to follow my instructions.  If you don't follow my instructions I will fire you[] and get someone else to take your place."  (Id.)  Morris alleges his complaints were otherwise ignored.  (Id. ¶ 42.)

In April or May 2008, Coney, with Greene's approval, allegedly "ordered" Morris to become the treasurer of Equity PAC.  (Id. ¶ 48.)  Morris opposed the appointment for fear of engaging in political activity during PHA work hours in violation of federal law and PHA policy.  (Id.)  Greene and Coney ignored Morris's concerns.  (Id.)  In his new position as treasurer, Morris discovered discrepancies in Equity PAC's records, so he refused to sign "inaccurate" state filings.  (Id. ¶ 49.)  When he refused, Greene and Coney "responded with rage and retaliation and threatened [Morris] with termination."  (Id. ¶ 49.)

**Ultimate Retaliation and Summary**

Ultimately, Morris alleges that "defendants" terminated him by demoting and transferring him to a position that paid $30,000 less than his position at the time.  (Id. ¶ 58.)  He contends defendants decided to demote him in April 2010 and that he eventually resigned on April 21, 2010.  (Id.)

The chart below summarizes the alleged instances of retaliation:

| Event | Date | Complaint To | Reaction | Cite to Am. Compl. |
|---|---|---|---|---|
| Greene using PIAHP payments to control non-union staff | June 2006 | Greene | Greene threatens to fire Morris | ¶¶ 28-31 |
| PHA-"sponsored" lobbying event | September 2006 | Greene | Greene threatens to fire Morris | ¶¶ 32-33 |
| Same | September 2006 | Coney | nothing indicated | ¶ 34 |
| Use of PHA federal funds to lobby state legislators | October 23, 2006 | no complaint indicated | no complaint alleged, but Morris alleges concerns ignored | ¶¶ 37, 42 |
| Use of PHA funds for TSSI postage for mailing campaign | January 2007 | Greene | Morris ignored | ¶¶ 43-44 |
| Embezzlement from TSSI | March 2007 | Coney | Morris ignored | ¶ 51 |
| Use of PHA funds for protest trip | June 2007 | Green, Coney | Greene threatens to fire Morris | ¶¶ 45-46 |
| Morris opposes PHA suit against HUD | December 26, 2007 | Greene | Greene threatens to fire Morris; otherwise ignored | ¶¶ 38-41, 42 |
| Embezzlement from TSSI | February/ March 2008 | Greene, Rosenthal | Greene shares concern; Rosenthal resolves without calling police; Morris refuses to sign agreement acknowledging funds repaid | ¶¶ 52-53 |
| Morris required to act as Equity PAC Treasurer | April/May 2008 | Greene, Coney | Greene, Coney ignore concerns and force Morris into position | ¶ 48 |
| Morris refuses to sign Equity PAC's state filings | April/May 2008 | Greene, Coney | Greene, Coney react with rage and retaliation and threaten to fire Morris | ¶ 49 |
| Embezzlement from TSSI and TSSI governance issues | June/July 2009 | Coney, Staley, Greene (per Staley) | Morris ignored | ¶¶ 54-55 |
| Concerns with TSSI Toys-for-Tots Program | December 2009 | Coney | Morris ignored | ¶¶ 56-57 |
| Morris demotion, pay cut, and transfer | April 2010 | "Defendants" | | ¶ 58 |

| Morris resigns | April 21, 2010 | "Defendants" | | ¶ 58 |
| Morris files original Complaint | October 14, 2010 | | | |

**Procedural History**

On April 28, 2011, the Court granted in part and denied in part Defendants' first motions to dismiss.  See Morris, 2011 WL 1661506, at *6.  The Court granted Morris leave to file an amended complaint to cure the deficiencies identified.  Morris timely filed his Amended Complaint and Defendants' present Motions seek to dismiss that Amended Complaint.  The Court heard oral argument on the Motions on July 29, 2011.  PHA also filed a Motion to Modify an exhibit filed with Morris's Amended Complaint.  (Mot., ECF No. 63.)

**II.    Jurisdiction and Standard of Review**

The Court has jurisdiction over Morris's § 1983 and § 1985 claims pursuant to 28 U.S.C. § 1331 and his state-law claim pursuant to 28 U.S.C. § 1367.

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept as true all well-pleaded factual allegations and must construe them in the light most favorable to the non-moving party.  Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008).

The Third Circuit has addressed the effect of the Supreme Court's most recent pleading-standard decisions, Twombly v. Bell Atlantic Corp., 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).  See Phillips, 515 F.3d at 233-34.  Twombly established a three-pronged approach for all civil actions: first, the court must identify the elements Morris must plead to state a claim; second, the court asks whether the complaint sets forth factual allegations or

conclusory statements; third, if the complaint sets forth factual allegations, the court must assume their veracity and draw reasonable inferences in favor of the non-moving party, but then must determine whether the factual allegations plausibly give rise to an entitlement to relief.  Santiago v. Warminster Twp., 629 F.3d 121, 130 & n.7 (3d Cir. 2010); see Iqbal 129 S. Ct. at 1950, 1953. For the second step, the court should separate the factual and legal elements of the claims, must accept the well-pleaded facts as true, and may disregard any legal conclusions.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

As the Court explained in its April 28, 2011 Memorandum, notice pleading is still the rule because Rule 8 is still in effect, but the concept of notice pleading has changed.  Pleadings must now be accompanied by either factual or legal assertions satisfying the elements of the claims made.  See Phillips, 515 F.3d at 234.  In other words, "notice pleading" now requires "notice" of at least those facts necessary to raise an inference that Morris has a claim.  See id. at 234-35 (concluding Rule 8 requires "some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation").

Nevertheless, it is "true that judging the sufficiency of a pleading is a context-dependent exercise.  Some claims require more factual explication than others to state a plausible claim for relief."  W. Penn Allegheny Health Sys. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010) (reversing district court's application of heightened scrutiny in antitrust context) (citations omitted).  Thus, pleading a civil rights claim may require fewer factual allegations than pleading an antitrust conspiracy or other complex business dispute.  Cf id. (suggesting a claim for simple assault may require fewer factual allegations than a claim for an antitrust conspiracy).

To state a claim, a plaintiff must allege circumstances with enough factual matter to

suggest the required claim exists.  Phillips, 515 F.3d at 234.  This does not impose a probability

requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable

expectation that discovery will reveal evidence of the necessary elements of the claims.  Iqbal,

129 S. Ct. at 1949; Phillips, 515 F.3d at 234.  A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to reasonably infer that the defendant is liable for the

misconduct alleged.  Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir.

2009).

**III.   Parties' Contentions**

Defendants make several arguments for dismissal of Morris's claims.  First, they argue

that the allegations in the Amended Complaint reveal that he made his complaints and objections

pursuant to his official duties and, therefore, his speech is not protected by the First Amendment.

In addition, they claim he has failed to sufficiently allege a causal connection between each

instance of alleged retaliation and his constructive discharge in April 2010.  Defendants also

contend that many of Morris's claims for alleged retaliation are barred by the statute of

limitations.  Regardless, Defendants contend they are entitled to qualified immunity because

there is no constitutional violation or because Morris's rights were not clearly established at the

time.[5]

As for Morris's conspiracy claims, Defendants contend whistleblowers are not a protected

class under § 1985, he did not assert a claim under § 1983 for conspiracy, and his allegations are

---

[5]       Rosenthal also argues she is entitled to absolute immunity, which Morris does not
address in his Omnibus Opposition.  Coney and TSSI also argue they cannot be liable under §
1983 because they are not state actors, but Morris contends the relationship between PHA and
TSSI establishes TSSI's and Coney's state-actor status.

insufficient to state the existence of a conspiracy.  They further contend he has insufficiently pled a due process claim.  Defendants also seek dismissal of Morris's <u>Monell</u> claims because there is no underlying constitutional deprivation and claims against the individual Defendants in their official capacities are redundant.  As for the PWL claim, Defendants contend it is barred by the 180-day statute of limitations, Morris failed to allege a causal connection, and several Defendants contend they are not "employer[s]" subject to the PWL.

In response, Morris argues that he had no duty to report issues or wrongdoing occurring at PHA, TSSI, or Equity PAC and, therefore, he spoke as a citizen entitled to First Amendment protection.  He contends that any specialized knowledge he gained in his positions did not arise from his day-to-day activities, but rather from "ultra vires activities he was made to perform by [D]efendants to further their political agenda."  (Omnibus Opp'n § V.A.)  He also contends his § 1983 claims are not barred by the statute of limitations because some events of retaliation occurred within the period and the remaining are actionable under the theory of a "continuing violation."  Further, he argues he sufficiently alleges a causal connection based on the timing of the retaliation either immediately after or days after he voiced concerns or objections, which is either unusually suggestive or suggests a causal link when considered with the pattern of alleged retaliation.

Although he does not address Defendants' § 1985 conspiracy arguments, Morris contends he sufficiently alleged a § 1983 conspiracy existed among Defendants because he alleged the members, the time, the place, the purpose, and several overt acts.  Morris suggests a jury could reasonably infer the existence of a conspiracy based on his allegations.

Morris next argues that qualified immunity is not appropriate for several reasons.  For

one, granting qualified immunity is premature at this juncture because the Court has other alternatives, such as permitting limited discovery on the issue. Alternatively, he argues the law was clearly established that public employees' speech is protected from retaliation when they speak on matters of public concern.

Finally, with regard to the PWL claims, Morris argues he was constructively discharged within the statute of limitations period and that the remaining conduct can be considered as part of a continuing tort. He does not address Defendants' causation arguments under the PWL.

## IV.   <u>Section 1983 Claims</u>

### A.   **Statute of Limitations**

Several Defendants contend that certain of Morris's § 1983 claims are barred by the statute of limitations because the alleged retaliation occurred, and thus the claim accrued, more than two years before Morris filed suit. Morris responds that any claims individually barred by the statute of limitations are still actionable as part of a continuing violation.

Section 1983 claims brought in Pennsylvania are subject to a two-year statute of limitations. <u>Lake v. Arnold</u>, 232 F.3d 360, 368-69 (3d Cir. 2000). State tolling rules apply to stop the period running, but federal law controls when the cause of action accrues and starts the clock. <u>See</u> <u>Dique v. N.J. State Police</u>, 603 F.3d 181, 185-86 (3d Cir. 2010). Under federal law, a civil rights cause of action accrues, and the limitations period begins to run, when the plaintiff knew or should have known of the injury upon which the cause of action is based. <u>Id.</u> Relevant to this case, a retaliation claim accrues when the plaintiff suffers the retaliation as a result of protected speech. <u>See</u> <u>O'Connor v. City of Newark</u>, 440 F.3d 125, 126-27 (3d Cir. 2006).

When a party claims multiple acts of discrimination, the Court must determine whether

the statute of limitations applies to each individual act or whether the acts should be aggregated as a continuing violation.  In O'Connor, the Third Circuit adopted the Supreme Court's bright-line rule in Title VII cases for § 1983 and § 1985 cases.  According to Morgan, each individual, discrete act starts a new clock for filing charges alleging the violation.  AMTRAK v. Morgan, 536 U.S. 101, 113 (2002).  Thus, individual discrete acts must be raised within the limitations period or they will not support the lawsuit.  O'Connor, 440 F.3d at 127 (citing Morgan, 536 U.S. at 113).  Discrete discriminatory acts are not actionable if they are time barred, even when they are related to acts in timely filed charges.  Id.  On the other hand, aggregated acts – those that are not individually actionable – may occur at any time so long as they are linked in a pattern of actions which continue into the applicable limitations period.  Id.  Thus, if an allegedly discriminatory act would not be actionable alone, the limitations period may not start running on that action until some related discrete act occurs.

The Third Circuit recognized a non-exhaustive list of individually actionable discrete acts, including termination and failure to promote, among others.  See id.  But the Third Circuit also noted that Morgan's rule that individually actionable allegations cannot be aggregated is of particular import in First Amendment retaliation cases because such retaliation is actionable even when relatively minor.  Id. at 127-28.  The threshold is very low and a cause of action exists for all but truly de minimis violations.  Id. at 128.  Accordingly, the Court must determine whether Morris alleges individually actionable retaliation and, if so, whether the limitations ran before he filed his complaint.

As indicated above, Morris claims retaliation based on threats to terminate his employment on several occasions, several instances of ignoring his complaints, and his eventual

demotion and constructive discharge.  Threats of job loss can be separately actionable, as can instances of ignoring complaints.  See Citta v. Borough of Seaside Park, No. 09-865, 2010 WL 3862561, at *12 (D.N.J. Sept. 27, 2010) (identifying ignoring complaints as retaliatory action); Savokinas v. Pittston Twp., No. 06-121, 2007 WL 2688729, at *5 (M.D. Pa. Sept. 11, 2007) (finding threat of loss of job sufficient retaliation).  Consequently, as Morgan instructs, a separate limitations period began to run for each alleged retaliation after it occurred.  As such, Morris was required to file suit within two years of each discrete instance where his job was threatened or his complaints were ignored.

Morris filed his original Complaint on October 14, 2010 (Compl. ECF No. 1), so the limitations period has expired for any threat or instance of ignoring his complaints which occurred before October 14, 2008.  Therefore, Morris cannot pursue his claims for the instances of alleged retaliation from June 2006 through April or May 2008.  The only actionable claims remaining are for the two instances he was ignored in June or July 2009 and October 2009, as well as his demotion in April 2010 and subsequent constructive discharge on April 21, 2010. See Hill v. Borough of Kutztown, 455 F.3d 225, 241-43 (3d Cir. 2006) (considering constructive discharge sufficient adverse action for retaliation claim); Ilori v. Carnegie Mellon Univ., 742 F. Supp. 2d 734, 752-53 (W.D. Pa. 2010) (concluding constructive discharge claim accrues either on date plaintiff communicates resignation to employer or date on which he knew he was unable to return to work).

Although not separately actionable, all of Morris's allegations can be considered evidence of the alleged hostile work environment that culminated in Morris's alleged constructive

discharge.  See Morgan, 536 U.S. at 113; (Am. Compl. ¶ 58).[6]

**B.** **First Amendment Retaliation**

**1.** **Legal Standards**

To state a § 1983 claim, the claimant must demonstrate that the defendants, acting under color of state law, deprived plaintiff of a right secured by the Constitution or the laws of the United States.[7]  Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008).  A plaintiff asserting a claim for retaliation must show two elements: (1) he or she engaged in activity protected by the First Amendment (which raises a question of law), and (2) the protected activity was a substantial factor in the alleged retaliatory action (which raises a question of fact).[8]  Hill, 455 F.3d at 241.

The Third Circuit employs a three-step burden-shifting approach for evaluating a public employee's § 1983 claim of retaliation for engaging in protected activity under the First Amendment.  See Reilly v. City of Atlantic City, 532 F.3d 216, 224 (3d Cir. 2008).  Under this

---

[6]    Rosenthal argues that Morris does not allege she engaged in any specific retaliation.  At most, she ignored his complaints of embezzlement at TSSI.  But, as mentioned above, ignoring complaints may be actionable.  Nevertheless, Morris alleges "defendants" decided to demote him and caused his constructive discharge, which is sufficient in this procedural posture to conclude Morris has alleged Rosenthal retaliated against him.  (See Am. Compl. ¶ 58.)

[7]    TSSI and Coney contend they are not state actors and, therefore, cannot be liable under § 1983.  Because the Court concludes Morris cannot allege a constitutional violation, the Court will assume TSSI and Coney are state actors without deciding the issue.

[8]    The second element consists of two sub-parts.  First, the alleged retaliation must be sufficient to deter a person of ordinary firmness from exercising his or her First Amendment rights.  Second, there must be a causal connection between the speech and the retaliation.  Revell v. City of Jersey City, 394 F. App'x 903, 906 (3d Cir. 2010).  The employee can show the requisite causal connection through (1) unusually suggestive temporal proximity between the speech and the adverse employment action, (2) a pattern of antagonism coupled with timing, or (3) an inference of causation gleaned from the record as a whole.  Id.; see Gladysiewski v. Allegheny Energy, 398 F. App'x 721, 723-24 (3d Cir. 2010).

approach,

> "(1) the employee must demonstrate that his/her speech is protected, that is, it addresses a matter of public concern and the 'employee's interest in the speech outweighs' the employer's countervailing interest 'in promoting workplace efficiency and avoiding workplace disruption' (i.e., the balancing test established in Pickering v. Bd. of Educ., 391 U.S. 563 (1968)); (2) the employee must prove that his/her speech was 'a substantial or motivating factor' in the retaliatory action against him/her, which, if proven; (3) shifts the burden to the employer to prove that the 'allegedly retaliatory action would have been taken absent the protected [speech].'"

Id.  A public employee's speech is protected, for the first element, when (1) in making it, the employee spoke as a citizen, (2) the statements involve matters of public concern, and (3) the employer did not have adequate justification for its treatment of the employee.  Hill, 455 F.3d at 241-42.

In Garcetti v. Ceballos, the Supreme Court narrowed the scope of protected activity by holding that "when public employees speak pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  547 U.S. 410, 421 (2006); see Reilly, 532 F.3d at 228.  In Garcetti, the plaintiff, Richard Ceballos, a deputy district attorney, investigated inaccuracies in an affidavit used to obtain a search warrant in a pending case, communicated his concerns to his supervisors regarding the matter, and wrote a memorandum recommending dismissal of the case.  Garcetti, 547 U.S. at 413-14.  Ceballos also testified on behalf of the defense regarding his concerns, and was demoted and transferred shortly after testifying.  Id. at 414-15.  Ceballos contended that his speech was constitutionally protected and the retaliation was unlawful, id. at 415, but there was no dispute he wrote the memorandum pursuant to his official duties, id. at 424.

-16-

In reaching its ultimate conclusion that Ceballos had no claim for retaliation, the Court stated that the controlling factor in the analysis was that he wrote the memorandum pursuant to his official duties.  Id. at 421.  Whether he conveyed his opinions internally or externally was not dispositive, nor was the fact that he opined on the subject matter of his employment.  Id. at 420-21.  And although the controlling factor depends on the employee's "official duties," job descriptions are neither necessary nor sufficient to demonstrate a particular task is within the employee's professional duties – employers cannot restrict employees' rights with excessively broad job descriptions.  Id. at 424-25.

Whether public employees speak pursuant to their official duties is a "practical" inquiry. Id. at 424; see Foraker, 501 F.3d at 241 n.7 (stating the "official duties" inquiry is nuanced). According to the Third Circuit, whether a particular incident of speech is made within the particular plaintiff's job duties is a mixed question of law and fact.[9]  Foraker, 501 F.3d at 240. Specialized knowledge and experience gained from the employee's position can demonstrate the employee's responsibilities or duties in a particular case.  See id. at 240 (concluding plaintiff's specialized knowledge and experience gained from daily interactions with equipment at issue placed plaintiffs in position to know when problems arose); Gorum v. Sessons, 561 F.3d 179, 185 (3d Cir. 2009) (considering speech part of official duties if arising from specialized knowledge and experience acquired through job); Cindrich v. Fisher, 341 F. App'x 780, 788 (3d Cir. 2009) (finding plaintiff's complaints of wrongdoing were based on specialized knowledge and experience acquired through job).

---

[9]      Thus, Morris's allegation that his additional assignments were outside the scope of his official duties need not be assumed true.  See Fowler, 578 F.3d at 210-11 (permitting court to ignore legal conclusions on motion to dismiss), (Am. Compl. ¶ 26).

Although the controlling factor is whether the employee was expected, pursuant to official duties, to report problems, the fact that the employee exceeds the expectations of the formal job description does not mean the speech is not within the scope of the employee's duties. Foraker, 501 F.3d at 241-42; see Baranowski v. Waters, No. 05-1379, 2008 WL 4000406, at *18 (W.D. Pa. Aug. 25, 2008) (stating inquiry is practical and eschews formal distinctions), aff'd 370 F. App'x 318 (3d Cir. 2009). Further, although not dispositive, several Third Circuit opinions find additional support for applying the "official duties" doctrine when the employee makes only internal reports, rather than external reports to law enforcement or the media. See, e.g., Skrutski v. Marut, 288 F. App'x 803, 807 (3d Cir. 2008); Kline v. Valentic, 283 F. App'x 913, 916-17 (3d Cir. 2008).

Two decisions from this District are particularly instructive for the instant matter. In Armbruster v. Cavanaugh, Judge Jones granted a motion to dismiss finding the plaintiff's speech, according to the allegations in the complaint, was made pursuant to his official duties. No. 09-1006, 2010 WL 816385, at *4 (E.D. Pa. Mar. 9, 2010).[10] Judge Jones considered the allegations that the plaintiff, a campus police officer, declined to comply with his superior's order to "push" demonstrators off campus. Id. at *2. The officer disagreed the demonstrators were disorderly and refused to comply with the order out of concern for violating the demonstrators' civil rights and facing suit for such a violation. Id. Judge Jones noted other circuits consistently hold that when a public employee raises complaints or concerns up the chain of command regarding job duties or assignments, such speech is undertaken in the course of performing the job. Id. at *3

---

[10]     The Third Circuit affirmed Judge Jones's decision, but noted the plaintiff abandoned his First Amendment retaliation claim on appeal. See Armbruster v. Cavanaugh, 410 F. App'x 564, 567 n.6 (3d Cir. 2011).

(citing <u>Davis v. McKinney</u>, 518 F.3d 304, 313 & n.3 (5th Cir. 2008)); <u>see also</u> <u>Cindrich</u>, 341 F.

App'x at 788 (finding complaints of wrongdoing made in performance of case assignments not

protected).  In <u>Armbruster</u>, the plaintiff was only present because he was "on the job" and was

ordered to be there to perform official duties; he spoke in response to a direct order issued in the

course of official business; and he complained to the superior doing the ordering.  <u>Id.</u> at *4.

Under those circumstances, the plaintiff was not speaking as a private citizen.  <u>Id.</u>  Rather, he

spoke while on duty, during work hours at his place of work, and he declined to obey a superior's

orders based on knowledge acquired during his employment experience.  <u>Id.</u>  In short, his

complaints about his job function up the chain of command were within his official duties and,

therefore, any alleged retaliation was not actionable.  <u>Id.</u>; <u>see also</u> <u>Baranowski</u>, 2008 WL

4000406, at *20 (suggesting public employee's voluntary and unsolicited comments or criticisms

can be pursuant to official duties).

In <u>O'Neill v. Philadelphia Housing Authority</u>, Judge Savage similarly found plaintiffs'

speech was made pursuant to their official duties and dismissed the complaint.  No. 11-0173,

2011 WL 2559716, at *3 (E.D. Pa. June 29, 2011).  In <u>O'Neill</u>, plaintiffs reported to their

supervisor allegations that a former co-worker had been extorting money from contractors.  <u>Id.</u> at

*1.  According to the plaintiffs' allegations, their duties were limited to inspecting ongoing

projects and ensuring compliance with contracts.  <u>Id.</u> at *3.  According to Judge Savage, courts

should also consider the implicit obligations of a public employee, and he opined it is not

reasonable or practicable to conclude that regardless of plaintiffs' official duties, public

employees do not have a duty to report allegations received during the course of employment that

fellow employees engaged in improper and illegal conduct.  <u>Id.</u>; <u>see</u> <u>Jendrzejewski v. Watson</u>,

No. 08-69, 2009 WL 789887, at *2 (W.D. Pa. Mar. 24, 2009) (granting partial dismissal because employee complained about co-workers' unlawful conduct pursuant to official duties). Moreover, Judge Savage noted that plaintiffs acquired this information through their job, which qualifies as specialized knowledge gained through the employment. O'Neill, 2011 WL 2559716, at *3. Finally, although not dispositive, plaintiffs only made internal reports to their supervisor, rather than external reports to law enforcement or the public. Id.

### 2.    Analysis

As an initial matter, in a supplemental letter brief requested by the Court, Morris suggests that some of his complaints may be more properly considered "petitions" for purposes of the Petition Clause of the First Amendment. Even assuming he characterized his claims as such in his Amended Complaint, informal internal complaints, up the chain-of-command, do not constitute petitioning activity. See Foraker, 501 F.3d at 237. Because Morris only alleges informal in-house complaints up the chain-of-command, he cannot "seek solace in the Petition Clause." See id. at 237-38.[11]

As for the speech claims, Defendants do not contest the statements were made on a matter of public concern. Instead, they argue Morris made the statements pursuant to his official duties

---

[11]    By letter, the Court requested supplemental briefing on the impact on this case of the Supreme Court's decision in Borough of Duryea v. Guarnieri, 2011 WL 2437008. The Court agrees with Defendants that the discussion in Guarnieri is inapposite to this case. The Supreme Court considered whether the "matter of public concern" test for public-employee Speech Clause cases should be an element for public-employee Petition Clause cases. 2011 WL 2437008, at *3. The Court concluded it should be, and relevant to this case, suggested that the framework for public-employee Speech Clause cases – which would include the official duties element – is an appropriate framework for public-employee Petition Clause cases. See id. at *10, 13. If this pronouncement encompasses the official duties element, based on the analysis below, Guarnieri further supports this Court's conclusion that Morris cannot "seek solace in the Petition Clause."

and failed to sufficiently allege a causal connection between the speech and the alleged

retaliation.[12]  After careful consideration of the allegations in the Amended Complaint, and for

the following reasons, the Court concludes that each instance of speech alleged in the Amended

Complaint was made pursuant to Morris's "official duties."  Therefore, the speech is not

protected and the Court need not proceed any further in its retaliation analysis.  See Foraker, 501

F.3d at 243 ("Because . . . [plaintiffs] were acting pursuant to their job duties when they made

their complaints . . . , we need not examine the remainder of the test established by Pickering and

its progeny.").  Although the instances of speech before October 2008 are time-barred, the Court

concludes that these instances would also fail to support a claim of a hostile work environment

because all of Morris's alleged speech was made pursuant to his official duties and is not

protected activity.

　　　According to the Amended Complaint, Morris "was the Executive Assistant to the

Executive Director of PHA, defendant Greene."  (Am. Compl. ¶ 2.)  His duties "included the

supervision and oversight of various troubled departments at PHA including . . . PHA's non-

profit organizations including TSSI."  (Id. at ¶ 25.)  He also alleges he was required to perform

work for Equity PAC, a political action committee, and to assist Coney at TSSI.  (Id. ¶¶ 25, 27.)

_____

[12]     Many of the instances of alleged retaliation occurred immediately after Morris's
speech, which easily alleges an unusually suggestive temporal proximity.  As for the demotion
and constructive discharge, which occurred approximately four months after the last instance of
speech, Morris has sufficiently alleged a pattern of antagonism coupled with timing.  The Court
considers the whole picture, not each individual piece of alleged antagonism.  See Marra v. Phila.
Hous. Auth., 497 F.3d 286, 302, 303 (3d Cir. 2007).  Considered as a whole, the Court finds that
a jury could easily infer a causal link in this case.  Over the course of a few years, Morris
repeatedly objected to unlawful or unethical conduct at PHA and TSSI, and each time was either
ignored or threatened with job loss.  A jury could infer that, eventually, Defendants decided the
best course of action was to demote Morris in hopes he would leave his job, which he did.  Thus,
Morris sufficiently alleged his speech was a substantial factor in the retaliation.

Many of the instances of Morris's allegedly protected speech came in response to Greene's orders to perform certain assignments.  For instance, the June 2006, September 2006, and October 23, 2006 complaints arose because Greene "ordered" Morris to perform certain tasks.  (See Am. Compl. ¶¶ 30, 32, 37.)  Morris's complaints in response to those orders were based on specialized knowledge and experience he gained pursuant to these assignments and because of his position, and the objections were in response to the nature of the assignments.  See Foraker, 501 F.3d at 240; Cindrich, 341 F. App'x at 788; Armbruster, 2010 WL 816385, at *4. In short, Morris complained about his job duties up the chain of command and, therefore, this speech was pursuant to his official duties.  See Armbruster, 2010 WL 816385, at *4.

With regard to the January 2007 and June 2007 complaints regarding use of PHA funds for lobbying efforts, Morris became aware of these issues only because of his position.  He acquired knowledge of this questionable conduct through his experience and job assignments. See Foraker, 501 F.3d at 240; Cindrich, 341 F. App'x at 788; O'Neill, 2011 WL 2559716, at * 3. Further, his speech was not outside the scope of his duties just because he may have exceeded expectations by suggesting the conduct may be improper.  See Foraker, 501 F.3d at 241-42.  For these reasons, these complaints were made within the scope of his official duties.

As for the financial concerns, including alleged embezzlement and the Toys-for-Tots discrepancies, at TSSI and Equity PAC, the Amended Complaint makes clear that Morris was admittedly responsible for overseeing troubled departments of PHA, including TSSI, and that he served as treasurer for Equity PAC, albeit over his objection.  (See Am. Compl. ¶¶ 25, 48.) Formal job descriptions are not dispositive, but it is not unreasonable to infer that an individual responsible for overseeing a troubled department would be expected to report suspected

embezzlement of funds from that department as well as any other corruption within the department.  See Foraker, 501 F.3d at 241-42; O'Neill, 2011 WL 2559716, at *3.  Even if these responsibilities were not within the formal job descriptions, exceeding expectations does not mean Morris acted outside the scope of his duties.  See Foraker, 501 F.3d at 241-42.  With regard to Equity PAC, Morris's refusal to comply with orders to sign the certification is analogous to the campus police officer's refusal in Armbuster – Morris was present because of his assignment, was directed to perform a function as a part of his position, learned of the discrepancies because of his position, and voiced concern regarding his job assignment up the chain-of-command.  See Armbruster, 2010 WL 816385, at *4.  Finally, offering unsolicited comments or concerns regarding information gathered in the course of his experience does not render Morris's comments outside the scope of his official duties.  See Baranowski, 2008 WL 4000406, at *20.

Finally, Morris's objection to PHA's lawsuit against HUD also was not protected speech.  According to the allegations in the Amended Complaint, Morris learned of Greene's intentions to file suit from Greene himself.  (Am. Compl. ¶ 40.)  Greene then ordered Morris to coordinate efforts to garner support for the litigation.  (Id. ¶ 41.)  It is clear from the Amended Complaint that Morris learned of Greene's intent only because of his position, which makes it specialized knowledge.  See O'Neill, 2011 WL 2559716, at *3.  Further, he again objected to a superior's direct assignment.  For many of the same reasons identified above, this objection was also made pursuant to Morris's official duties and, therefore, is not actionable.[13]  Although not dispositive,

---

[13]      Because Morris cannot show a violation of a constitutional right in support of this claim, Defendants are entitled to qualified immunity.  See Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010).  Rosenthal also seeks absolute immunity, but absolute immunity does not apply to retaliation and constructive discharge cases.  See Hill, 455 F.3d at 243.

the Court finds further support for its conclusion in the fact that Morris made only internal complaints to individuals in positions of authority.  See id.

Because all of Morris's speech was made pursuant to his official duties, his speech is not entitled to First Amendment protection.  Consequently, his subsequent demotion and ultimate constructive discharge allegedly related to his unprotected speech are not actionable under federal law.[14]  For these reasons, the Court will dismiss Morris's § 1983 retaliation claims in Count I.

### C.    Due Process and Equal Protection Claims

It is unclear from the Amended Complaint whether Morris is actually asserting due process and equal protection claims.  He cites the Equal Protection Clause early in the Amended Complaint, but then makes no other reference.  (See Am. Compl. ¶ 5.)  He also cites "due process" and the Fourteenth Amendment, but does not appear to allege a constitutional claim other than retaliation.  (See id. ¶¶ 5, 63, 73.)  The Court already granted Morris one opportunity to amend his complaint and expressly advised him to clarify any due process claim he is asserting.  See Morris, 2011 WL 1661506, at *5.  Morris's failure to sufficiently allege his claims on his second opportunity with explicit directions from the Court warrants dismissal of his insufficiently pled due process and equal protection claims with prejudice.

---

[14]    Rosenthal, Coney, and TSSI argue they had no authority over Morris and, therefore, cannot be liable for his demotion and constructive discharge.  But a supervisor who lacks power to terminate a subordinate may nonetheless abuse his or her power with respect to that subordinate, and may even constructively discharge the subordinate, provided the supervisor exercises some power over the employee.  Hill, 455 F.3d at 240.  Morris explicitly alleges that Coney was one of his direct supervisors.  (Am. Compl. ¶ 24.)  Further, the Court can infer from the allegations of the Amended Complaint that Morris perceived Rosenthal had some authority over him because he reported suspected embezzlement to Rosenthal.

Furthermore, Morris did not respond to Defendants' Motions with regard to the due process claim, if even asserted.  Therefore, the Court will exercise its discretion and grant Defendants' Motions as unopposed on this claim.  See E.D. Pa. LR 7.1(c).  For these reasons, the Court will dismiss the remainder of Morris's § 1983 claims in Count I.

### D.     Civil Conspiracy Claims under § 1983 and § 1985

It is unclear from the Amended Complaint whether Morris is pursuing a § 1983 conspiracy claim or a § 1985 conspiracy claim.  For instance, in his Count III alleging the conspiracy claim, Morris cites only § 1985 (Am. Compl. ¶ 80), but earlier he alleges a conspiracy in the same context he alleges a claim under § 1983 (id. ¶ 5).  Regardless, the Court concludes Morris has not sufficiently alleged a claim under either section.

First, as a whistleblower, he cannot maintain a claim under § 1985.  Claims under § 1985 must allege class-based invidious discrimination.  See Farber v. City of Paterson, 440 F.3d 131, 135 (3d Cir. 2006).  "Class" connotes something more than a group of individuals who share a desire to engage in conduct that the defendants disfavor.  Id. at 135-36.  Instead, the class must have an identifiable existence independent of the fact that its members are victims of the defendants' conduct.  Id. at 136.  The Third Circuit acknowledges the difficulty of this task when the putative class at issue is defined by mutable characteristics such as opinion or conduct.  Id. at 137.

Although the Third Circuit has not yet determined whether whistleblowers constitute a "class" for purposes of § 1985, each court of appeals to consider the issue agrees they do not. See Childree v. UAP/AG Chem., 92 F.3d 1140, 1147 (11th Cir 1996); Hicks v. Resolution Trust Corp., 970 F.2d 378, 382 (7th Cir 1992); Deubert v. Gulf Fed. Sav. Bank, 820 F.2d 754, 757 (5th

Cir. 1987); Deretich v. Office of Admin. Hearings, 798 F.2d 1147, 1153 (8th Cir. 1986); Buschi

v. Kirven, 775 F.2d 1240, 1258-59 (4th Cir. 1985).  In light of this authority, and the Third

Circuit's suggestion that a "class" connotes something more than a group of individuals who

share a desire to engage in conduct, e.g. whistleblowing, the Court concludes Morris cannot

maintain a claim for a § 1985 conspiracy.

Second, there can be no liability for a conspiracy to violate § 1983 without an actual

violation of § 1983.  Marchese v. Umstead, 110 F. Supp. 2d 361, 371 (E.D. Pa. 2000).  For these

reasons, the Court will dismiss Morris's conspiracy claims under Count III.

### E.  Monell Claims

The Court will grant Defendants' Motions on Morris's Monell claims for two reasons.

First, suing the individual defendants in their official capacity is redundant.  See O'Neill, 2011

WL 2559716, at *2 n.5.  Official capacity suits cannot be maintained against state actors in their

official capacity on behalf of the state, Hill v. City of Philadelphia, 331 F. App'x 138, 142 (3d

Cir. 2009), because state officers sued for damages in their official capacity are not "persons"

under § 1983; rather, they assume the identity of the government that employs them, Hafer v.

Melo, 502 U.S. 21, 27 (1991).

PHA and TSSI, the alleged state entities, also are entitled to dismissal of these claims

because a municipality may not incur Monell liability if there is no underlying constitutional

violation or injury.  Marable v. W. Pottsgrove Twp., 176 F. App'x 275, 283 (3d Cir. 2006).  For

these reasons, the Court will dismiss Morris's § 1983 claims under Count II.

### V.  Pennsylvania Whistleblower Law

The Court has dismissed all claims over which it exercises original jurisdiction.

Accordingly, the Court declines to exercise supplemental jurisdiction over Morris's state-law claim in Count IV.  See 28 U.S.C. § 1367(c).

**VI.**     **PHA's Motion to Modify Exhibits**

PHA also filed a motion to modify one of Morris's exhibits – a copy of a personal check drawn on the account of Helen Ferris.  (Mot., ECF No. 63; see Am. Compl. Ex. D.)  At the time of the Motion, Ms. Ferris was PHA's acting general counsel.  The check identifies Ms. Ferris's financial account number in violation of Federal Rule of Civil Procedure 5.2(a) as well as her home address and home phone number.  (Mot.; Greene Mot. to Dismiss at 21 & n.11.)  Morris has not responded to PHA's Motion.  For this reason, and because Ms. Ferris is not a party to this action, the Court will exercise its discretion and grant the Motion.  See E.D. Pa. LR 7.1(c); see also Pichler v. UNITE, 238 F.R.D. 405, 409 (E.D. Pa. 2006) (concluding plaintiff must redact home address and "any other information that might be used to ascertain personal banking information" to protect account holder's privacy).

**VII.**     **Conclusion**

For the foregoing reasons, the Court will **grant** Defendants' Motions to Dismiss and PHA's Motion to Modify.  An appropriate Order will follow.

O:\Todd\10-5431 Morris v. PHA et al\Morris - 2d MTD Memo - FINAL.wpd